**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Chad Carpenter, an individual, | No. CV16-01768-PHX DGC |
| Plaintiff/Defendant, | **ORDER** |
| v. | |
| All American Games, a limited liability company, Douglas Berman, an individual, and Does 1-30, inclusive, | |
| Defendants/Counterclaimants. | |

Defendant All American Games, LLC ("AAG") has moved for partial summary judgment on Plaintiff Chad Carpenter's defamation claim. Doc. 37. The motion is fully briefed (Docs. 39, 41), and no party has requested oral argument. For reasons that follow, the Court will deny the motion.[1]

**I.   Background.**

AAG, through its subsidiary Football University, LLC, operates a national youth football tournament and football camps in more than 20 U.S. markets, including camps in Phoenix, Seattle, Denver, and various cities in California. Doc. 38 ¶ 1. Carpenter is a former AAG employee. *Id.* ¶ 2. As AAG's "West Coast Director," Carpenter was responsible for recruiting athletes to participate in the camps in his region and recruiting

---

[1] Defendant filed its motion for summary judgment without first exchanging letters with Plaintiff and scheduling a telephone conference as required by the case management order. Doc. 19 at 5, ¶ 11. Although this could provide an independent basis for denying the motion, the Court will deny the motion on the merits.

teams to participate in the national tournament. *Id.* In 2015 Carpenter was being paid a base salary of $65,000 and was eligible to receive commissions based on his camp and tournament enrollment revenue. *Id.* ¶ 3.

Carpenter was terminated on June 10, 2015. On the same day, AAG's chairman, Douglas Berman, sent the following e-mail to 54 recipients:

> Everyone –
>
> As of this morning, AAG terminated its employment of Chad Carpenter. Without going further, this move was necessitated because of conduct that was violative of the norms of integrity and professionalism expected of members of the AAG community.
>
> We will be adjusting in the short term to execute the LA camp and coordinate the transition of other responsibilities for territories that Chad was responsible for.
>
> Douglas Berman
> Chairman/CEO, All American Games, LLC

Doc. 37-1 at 11-12; Doc. 38 ¶ 10. Carpenter asserts a defamation claim based on this e-mail.[2]

The parties offer conflicting explanations of the circumstances leading up to the e-mail. AAG alleges that in May 2015 it "uncovered a troubling and improper relationship between Plaintiff and another former employee," Karen King, which prompted an investigation and ultimately led to Carpenter's termination. Doc. 37-1 ¶ 5. AAG claims that King was manipulating AAG's financial systems to inflate revenue numbers and that

---

[2] Carpenter also asserts a claim based on alleged oral statements made by Berman and Carpenter's supervisor to "notable NFL coaches," in which they allegedly stated that Carpenter was fired for "stealing money and fixing the books, having an affair and just other bad stuff." Doc. 39-1 at 5; Doc. 37-2 at 11. But Carpenter has presented no evidence of these oral statements other than his own declaration that various coaches called him and told him about the statements. The Court will not consider this testimony for the purpose of ruling on this motion because it is inadmissible hearsay. *See* Federal Rules of Civil Procedure 56 (declaration used to oppose a summary judgment motion must "be made on personal knowledge" and "set out facts that would be admissible in evidence"); *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) (third party's testimony regarding allegedly defamatory statement made between two persons outside the third party's presence is inadmissible hearsay).

it "found considerable evidence that Plaintiff was fully knowledgeable of [King's] fraudulent actions." *Id.* ¶¶ 6, 8. AAG cites two additional reasons for the termination: Carpenter offered discounts to customers without authorization to inflate his revenue and was "gross[ly] insubordinate[e] with respect to his supervisor," Steve Quinn. *Id.* ¶¶ 9-10. Carpenter disputes each of these reasons and claims that AAG conducted a "half-baked" investigation and fired him because it was struggling financially and Quinn did not like him. Doc. 39-1 at 3, 5. Carpenter asserts that neither he nor King manipulated financial records, and that the "considerable evidence" AAG claimed to possess is discredited by his controverting evidence. Doc. 39-1 at 2-5.

To support its claim that it had considerable evidence of financial misreporting, AAG produces various e-mail threads between Carpenter and King, in which the two discuss reaching a certain revenue amount for Carpenter to receive a higher commission. Doc. 39-1 at 17-18; Doc. 37-1 at 7-9. In these e-mails, Carpenter states: "[b]etter get over a 250 FPE seriously Karen,"[3] and King makes statements such as "[w]e will get you the higher payout [f]or Seattle" and "I will do everything I can to make it happen . . . [e]ven if I have to sell my soul to the devil." *Id.* Carpenter's declaration explains that the e-mails do not suggest fraud, but simply evidence tactics he used to motivate his team to reach their target FPE numbers – part of his job. Doc. 39-1 at 3.

AAG also produces screenshots from its accounting systems, AGGIS and Cybersource, which allegedly prove that King misreported revenue on eight occasions. Doc. 39-1 at 13-15, 26-43. AGGIS was used to track customers and report revenue for calculating commissions, while Cybersource was used to process actual payments received. Doc. 39-1 at 15-16. AAG identifies eight instances where there were discrepancies between the amount King reported in AGGIS and the amount actually processed in Cybersource. Doc. 39-1 at 14-15. Carpenter responds with a number of

---

[3] "FPE" is an abbreviation for "fully paid equivalent." Doc. 39-1 ¶ 19. AAG sets a threshold FPE number, which the employee must reach in order to receive a commission. *Id.* The number is calculated by dividing a camp's total revenue by the price of one camp admission. *Id.*

explanations, including that AGGIS experienced technical glitches during the 2015 camps that may have caused the discrepancies, and that participants often pay portions of their fee in cash when they arrive at camp, but the cash receipts are not always reflected in AGGIS. Doc. 39-1 at 2-3, 5. Carpenter also argues that the screenshots AAG provided are illegible, some of the corresponding screenshots appear to have different names on them, AAG has refused to provide bank statements that would account for cash payments, and AAG discontinued using AGGIS and Cybersource, which prevents him from substantiating his claim that there was no misreporting.[4] Doc. 39 at 5-6.

In support of its second reason for the termination – unauthorized discounts – AAG cites four e-mails in which Carpenter directed another employee to give a reduced price. Doc. 39-1 at 13. Carpenter asserts that it was an AAG practice to offer these discounts, that Quinn trained him to give discounts, and that every AAG sales person gave these discounts. Doc. 39-1 at 3-5. Carpenter contends that he is the only sales person who has ever been penalized for doing so. *Id.* Carpenter also claims that AAG did not investigate the discounts until after his termination. Doc. 39-1 at 4.

In support of the alleged "gross insubordination," AAG cites three e-mails Carpenter sent to King, in which Carpenter referred to Quinn "in an insulting, undermining and unprofessional manner." Doc. 39-1 at 11. Carpenter responds that even if these comments constitute gross insubordination (which he disputes), they could not have served as the basis for his termination because they were not discovered until after he was fired. Doc. 39-1 at 4.

Carpenter also alleges that when AAG representatives interviewed him before his termination, they refused to provide him with any evidence and refused to allow him to

---

[4] Carpenter's response asks the Court to grant an adverse inference for spoliation of evidence based on AAG's failure to maintain access to AGGIS and Cybersource. These systems apparently contain electronically stored information ("ESI"), and yet Carpenter fails to address the standards for spoliation of ESI added to the Federal Rules of Civil Procedure on December 1, 2015. *See* Fed. R. Civ. P. 37(e). Because Carpenter has failed to address this controlling law, he has not shown that he is entitled to an adverse inference instruction.

1  explain. Doc. 39-1 at 3. Carpenter did not receive a written explanation of the reasons
2  for his termination. Doc. 39 at 8.

## II. Summary Judgment Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Discussion.

The tort of defamation requires a false and defamatory statement, an unprivileged publication of the statement to a third party, and fault on the part of the publisher. *Rowland v. Union Hills Country Club*, 757 P.2d 105, 110 (Ariz. Ct. App. 1988). AAG seeks summary judgment on Carpenter's defamation claim because (1) the allegedly defamatory statement is true, (2) the statement is protected by a qualified privilege, and (3) Carpenter has not established damages. Doc. 37 at 1. The Court will deny summary judgment because there is a genuine factual dispute as to each of these issues.

### A. Truth.

"To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Dube v. Likins*, 167 P.3d 93, 105 (Ariz. Ct. App. 2007) (quoting

*Turner v. Devlin*, 848 P.2d 286 (Ariz. 1993)). A statement cast in terms of opinion is actionable if it implies false facts on which the opinion is based. *Id.* at 106. AAG's statement that Carpenter's termination was "necessitated because of conduct that was violative of the norms of integrity and professionalism expected of members of the AAG community" reasonably could be viewed by a jury as implying that Carpenter violated AAG norms related to integrity and professionalism, and that the violation was serious enough to "necessitate" his termination. Such a statement could be viewed as impugning Carpenter's honesty, integrity, virtue, or reputation. *See id.* (statement suggesting that a university student violated university policy was capable of defamatory meaning).

AAG argues that Carpenter has not created a genuine dispute as to the falsity of the statement because its evidence shows Carpenter violated AAG policy in the three ways explained above: financial misreporting, unauthorized discounts, and gross insubordination. But viewing the evidence in the light most favorable to Carpenter, the Court cannot say as a matter of undisputed fact that Carpenter violated AAG norms. Carpenter presents testimony that disputes each of the alleged violations. He presents plausible alternative explanations for the reporting discrepancies; he disputes that seeking authorization for discounts was an AAG norm; and he disputes that referring to a supervisor in an insulting manner violated AAG norms because his own supervisor engaged in similar behavior.[5] The question of truth does not lend itself to determination as a matter of law on this record. At the summary judgment stage, "the judge does not weigh disputed evidence" or "make credibility determinations." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005).[6]

---

[5] The Court also notes that AAG presented no evidence to establish the relevant "norms" it claims were violated.

[6] Neither party has suggested that this case involves a matter of public concern. If it does not, Carpenter would not have the burden at trial of proving falsity; rather, AAG would have the burden of proving its affirmative defense of truth. *See Turner v. Devlin*, 848 P.2d 286, 290 (Ariz. 1993). Even if the burden were on Carpenter, however, the Court finds that he has presented sufficient evidence to create a genuine issue of fact on the truth of the e-mail's assertions.

### B. Qualified Privilege.

AAG also asserts that Carpenter cannot prove unprivileged publication to a third party because the statement was protected by the "common interest" qualified privilege. Arizona recognizes a qualified privilege for circumstances in which "one is entitled to learn from his associates what is being done in a matter in which he has an interest in common with them." *Green Acres Tr. v. London*, 688 P.2d 617, 625 (1984) (quoting Restatement (Second) of Torts § 596, cmt. c). "Co-managers in a company would have a common interest in learning of an employee's termination." *East v. Bullock's Inc.*, 34 F. Supp. 2d 1176, 1183 (D. Ariz. 1998) (privilege applied where vice president of human relations informed company's senior managers that an employee was terminated for falsifying company records). Once a defendant demonstrates that the privilege arose, a plaintiff can defeat the privilege with proof that it was abused, either by actual malice or excessive publication. *Green Acres Tr.*, 688 P.2d at 624.

Here, the parties agree that the allegedly defamatory e-mail was sent to at least 54 recipients. Berman describes the list as "AAG employees and coaches," and admits that AAG's vice president forwarded the e-mail to "part-time coaches and other staff who worked on the FBU camps." Doc. 37-1 ¶ 11. Carpenter describes the recipients as "a countless number of unnecessary people including volunteers, consultants, independent contractors, part-time coaches, and parents of kids." Doc. 40 ¶ 21. But neither party actually identifies the recipients or their relations to AAG – information that might allow the Court to determine whether the recipients had a common interest in learning of Carpenter's termination. On this record, the Court cannot determine as a matter of undisputed fact whether the privilege arose, let alone whether it was abused through excessive publication. The Court therefore cannot grant summary judgment on this basis.[7]

---

[7] AAG argues that Carpenter has presented no evidence of malice, but such evidence is not needed if the privilege never arose or if AAG engaged in excessive publication. The lack of malice evidence, therefore, does not entitle AAG to summary judgment.

- 7 -

**C. Damages.**

AAG argues that summary judgment is warranted because Carpenter failed to present evidence of damages. To prevail on a defamation claim, a plaintiff generally must prove actual damages, which are not limited to out-of-pocket losses but include "the more customary types of harm inflicted by defamatory falsehood" such as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Boswell v. Phoenix Newspapers, Inc.*, 730 P.2d 186, 196-97 (Ariz. 1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350-51 (1974)). A jury's award of damages "must be supported by competent evidence," but "there need be no evidence which assigns an actual dollar value to the injury." *Id.* at 197.

AAG asserts that Carpenter did not produce any documents in response to its request for documents relating to damages, and therefore cannot prove the damages element of his defamation claim. Doc. 37 at 3. But AAG cites no case, and the Court has found none, holding that a plaintiff must have documentary evidence of damages in a defamation case. Rather, a plaintiff simply must produce evidence that would be competent to support a jury's finding of actual reputational harm. *See Boswell*, 730 P.3d at 196-97.

Carpenter's declaration asserts that, as a result of the defamatory e-mail, he received phone calls from people in the community which were "really embarrassing" and that his "friends, colleagues, and future sources of employment now question [his] character and employability." Doc. 39-1 at 5; Doc. 39-2 at 23. This testimony creates an issue of fact as to whether Carpenter suffered personal humiliation and reputational harm. Moreover, a reasonable jury could conclude that AAG's e-mail was defamatory per se, which could entitle Carpenter to presumed damages. *See Hirsch v. Cooper*, 737 P.2d 1092, 1096 (Ariz. Ct. App. 1986) (when a publication is libelous per se, "presumptive damages may be awarded without proof of special damages") (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)). Libel per se includes a written communication that, on its face and without resort to extrinsic evidence, tends to impeach

one's honesty, integrity, virtue, or reputation. *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222-23 (Ariz. 1977). The statement from Carpenter's employer could be viewed by the jury as calling into question his honesty and integrity.

**IT IS ORDERED:**

1. Defendant's motion for partial summary judgment (Doc. 37) is **denied**.
2. The Court will schedule a conference call to set a final pretrial conference and trial date by separate order.

Dated this 10th day of October, 2017.

_____
David G. Campbell
United States District Judge